JOHN B. WOOD v. CHICAGO, ST. PAUL, MINNEAPOLIS & OMAHA RAIL-
WAY COMPANY.[1]

September 28, 1896.

Nos. 9832—(43).

**Railway—Injuries to Brakeman—Negligence.**

The plaintiff, a brakeman on one of defendant's freight trains, while engaged in attempting to uncouple the engine from the train while in motion, was injured by reason of the train breaking in two, and a subsequent collision between the detached parts. *Held*, that under the evidence it was a question for the jury whether the "swingman," who was on top of the car next the engine, exercised reasonable care in watching the rear of the train and in keeping a lookout in that direction for signals from the conductor.

Appeal by plaintiff from an order of the district court for Ramsey county, Kelly, J., denying a motion for a new trial.    Reversed.

*Butts & Jaques*, for appellant.

*Thomas Wilson* and *Davis, Kellogg & Severance*, for respondent.

MITCHELL, J.    This was an action to recover for personal injuries to plaintiff, caused by the alleged negligence of the defendant; and the only question which we find it necessary to consider is whether, under the evidence, the trial court was justified in directing a verdict for the defendant.

The plaintiff was employed as head brakeman on defendant's "transfer" train which ran between its yards in East St. Paul and East Minneapolis, via the Great Northern tracks, for the purpose of

[1] Reported in 68 N. W. 462.

66 M.—4

transferring freight cars. The train crew, in addition to the plaintiff, consisted of an engineer, fireman, conductor, rear brakeman, and middle brakeman, or "swingman." On the day in question they were taking a heavy train of 46 cars, partly loaded and partly empty, from East St. Paul to East Minneapolis. It was their intention, when they reached "the Great Northern connection," to cut off the engine, and run it down the main track of the Omaha yard, and then make a "drop switch" (it being a down grade), and run part of the cars in on one track and part in on another track in the yard. When they reached the proper point, the plaintiff, in the line of his duty, went down between the cars and the engine for the purpose of cutting off the engine. On attempting to do so he found the pin fast, and was unable to pull it out. The middle brakeman, or swingman, who was on top of the car next the engine, seeing that plaintiff was unable to pull the pin, signaled the engineer to stop, and proceeded to set brakes. No question is made but that, under ordinary circumstances, this was the proper thing to do in order to enable plaintiff to get out the pin.

It appears, however, that immediately preceding this the train had broken in two, and the rear cars (variously estimated from 12 to 17, and mostly loaded) became separated from the front part of the train. Immediately following this break the front part of the train evidently moved faster than the rear part, for, according to all the testimony, the two parts became separated by a considerable space. But the effect of the engineer's stopping or slowing up in response to the signal of the swingman was that the rear part of the train caught up with the front part, and collided with it with sufficient force to drive in the drawbar on the front car so as to catch plaintiff's arm and cut off his hand. The plaintiff, being down between the car and the engine, had no means of seeing, and received no warning that the train had broken in two or that a collision was imminent.

The evidence tends to show that the conductor and the rear brakeman were on top of the rear portion of the train, and that when the former discovered that the train had broken in two he signaled to the swingman to go ahead, in order to keep the front part of the train out of the way, but was unable to attract the attention of the swingman, who was then engaged in setting brakes on the front car,

in order to slow up the train for the purpose already stated.    The evidence also tends to show that the conductor proceeded to set brakes on the rear portion of the train, and signaled the rear brakeman to do likewise, in order to prevent its coming in collision with the front part of the train, but was unable to check its speed quickly enough to avoid the collision.    At the time the train broke in two its speed was variously estimated by the witnesses at from six to ten miles an hour.

Unfortunately, the case on part of the plaintiff was not tried on any definite theory as to the precise ground of negligence on part of the defendant, urged as the proximate cause of plaintiff's injury. Counsel suggested to the trial court and jury, as he does here, a number of alleged acts of negligence on part of defendant's employés, which might have caused the accident, most of which are unsupported by the evidence.

For example, he claims that another brakeman on the train, who had previously discovered that the pin between the first car and the engine was fast, was negligent in not reporting the fact.    But, conceding this to be so, it is sufficient answer to say, as was suggested by the trial judge, that this was not the proximate cause of plaintiff's injury.    Again, he suggests that the engineer was negligent in not keeping a lookout backward, so as to watch the condition of the train.    But it does not appear that the engineer had the opportunity, or that it was his duty, to do so.    On the contrary, the evidence is that this was the duty of those on the top of the train, and that the engineer received his signals from the swingman.

Counsel also suggest that the train did not break in two, but was cut in two by the trainmen without having the rear part under proper control.    But there is no evidence to support any such theory. On the contrary, the evidence is that the parting of the train was caused by a broken link.    In view of the fact that no satisfactory cause for such a break is made to appear, there may be ground for suspicion or conjecture that the testimony that a link broke may not be true, yet, the burden of proof being on plaintiff, a verdict in his favor cannot be predicated on mere suspicion or conjecture.

It is also suggested that the conductor was on the caboose, and not at his post of duty on top of the cars, and hence neither discovered the break nor took any steps to prevent a collision.    But the positive

evidence of the conductor is that he was on top of the cars, and gave repeated signals to the swingman; and as against this there was nothing but the testimony of one, possibly two, bystanders, whose attention does not seem to have been particularly attracted to the matter, that they saw only one man on the rear part of the train. The burden of proof being on the plaintiff, this state of the evidence would not have justified a verdict in his favor on the ground last suggested.

It is further claimed that the conductor was negligent in giving merely the "Go ahead" instead of the "Break in two" signal. But the answer to this is that the evidence is that the conductor was wholly unable to attract the attention of the swingman; that the latter did not see the signal given, because he was not looking for signals. Hence it was wholly immaterial what signal the conductor might have given, because in no event would the swingman have seen it.

But there is one question upon which we are of opinion that the case ought to have been submitted to the jury, viz. whether the swingman exercised reasonable diligence in keeping watch as to the condition of the train, and for signals from the conductor on the rear. The evidence is that it was the duty of conductors and brakemen to keep a lookout to see that the train had not parted, and in case of a break to take the greatest care to prevent a collision between the detached parts; that it was particularly the duty of the swingman to look out for signals from the rear end of the train; that it was his duty to watch the rear end of the train so as to avoid accident in case the engine and different parts of the train should be in different connections. The evidence also is that breaks in freight trains are not infrequent, and that, when they do occur, the greatest care and the most prompt action are necessary to prevent a collision between the two parts. This was a long, heavy train. The plaintiff, while in the line of his duty in uncoupling the engine, was in no position to keep a lookout to protect himself in case of any accident to the train, but his safety in any such contingency depended on the care of those on top of the train. He was in a place of danger in case of a sudden collision of the detached parts of a broken train. These facts were presumably known to the swingman.

While certain undisputed facts demonstrate that the estimates of the witness Mellen as to spaces and distances are incorrect, yet there was credible evidence from which the jury might have found that the train moved a distance of some 800 feet after the break was discovered and before the collision, and that after the break, and before the engineer "slowed up," the two parts of the train became separated the length of 5 or 6 cars, or somewhere in the neighborhood of 200 feet. The evidence tended to show that during that time the swingman was not watching the rear of the train, or keeping any lookout for signals from that direction; that, according to the testimony of the conductor, he gave the swingman the go ahead signal four, five, six, or seven times; that the swingman did not obey the signal, and did not appear to see it, his head being bent over a brake which he was setting on the front car; that, while thus engaged, although stooping over the brake, he was facing towards the rear of the train, where the conductor was. Of course, the duties of the swingman were multifarious, and he could not be looking in two opposite directions at the same time, and his conduct is to be measured by a reasonable standard.

It would be improper for us now to discuss the weight of the testimony, but, in view of all the facts in evidence, our conclusion is that the questions whether the swingman was, under the circumstances, in the exercise of reasonable care in watching the rear of the train and looking for signals from that direction, and whether he should not, by the exercise of proper care, have either discovered the break or seen the signals of the conductor in time to signal the engineer to go ahead, and thus prevent the collision, or at least in time to warn the plaintiff of the impending danger, so that the latter might protect himself, ought to have been submitted to the jury. We therefore hold that the court erred in directing a verdict.

The order appealed from is reversed, and a new trial ordered.

Counsel for plaintiff has, in his zeal for his cause, so far forgotten his duty to the court as to make in his brief an improper attack on the motives and conduct of the trial judge, which is entirely unjustified by anything we can discover in the record. As courteous and respectful treatment of the courts by the bar is essential to the due administration of justice, we do not feel that we ought to permit

this matter to pass without notice. It is therefore ordered that the brief of plaintiff's counsel be stricken from the files of this court, and that no disbursements for printing the same be allowed in the taxation of costs.